UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------X
UNITED STATES OF AMERICA,

          -against-　　　　　　　　　　　　　　**MEMORANDUM & ORDER**
                                                                               96-CR-527 (PKC)

ROCKY FREEMAN,

          Defendant.
----------------------------------------------------------X
PAMELA K. CHEN, United States District Judge:

Before the Court is Defendant Rocky Freeman's ("Freeman") request for a reduction in his sentence pursuant to the compassionate release provisions of the First Step Act, 18 U.S.C. § 3582(c). (Mot. for Compassionate Release, Dkt. 306.)[1] The Government opposes the motion. (Gov't Opp'n, Dkt. 309 ("Gov't Opp'n 1"); Gov't Opp'n, Dkt. 332 ("Gov't Opp'n 2").) For the reasons set forth herein, the motion is granted.

## BACKGROUND[2]

Freeman is currently serving two consecutive life sentences related to his involvement with a drug trafficking organization. Freeman's co-defendant, Roberto Mateo-Feliz, ran the organization, which distributed crack and cocaine in a section of East New York, Brooklyn,

---

[1] Three docket entries, Dkts. 306, 314, and 328, are filed as separate motions, but seek the same relief on different bases. The first two filings were made by Freeman proceeding *pro se* while the third was submitted by appointed counsel. The Court considers these submissions as a single motion under Dkt. 306, and Dkts. 314 and 328 will be terminated. Additional filings intended to supplement the record were also erroneously filed as motions. The Court has considered the later-filed materials as supplemental submissions in support of the motion; accordingly, motions docketed as numbers 336, 338, 340, 343, 345, 347, and 349 were terminated on August 31, 2023. (*See* 8/31/2023 Dkt. Order.)

[2] The factual background here is taken from the Presentence Investigation Report (the "PSR") dated September 10, 1998, and subsequent amendments thereto.

beginning in approximately 1987.  (PSR ¶¶ 5–6.)  Mateo-Feliz used various means to protect the organization, including murder or attempted murder of rivals.  (*Id.* ¶ 23.)  Between 1989 and 1994, Mateo-Feliz ordered or personally caused the death of five individuals.  (*See generally id.* ¶¶ 28–48.)  Freeman reported directly to Mateo-Feliz but held no supervisory role in the organization.  (*Id.* ¶ 71.)

Freeman and three co-defendants, including Mateo-Feliz and Francisco Pellicier, were indicted on various charges in the Fourth Superseding Indictment ("S-4 Indictment").  (S-4 Indictment, Dkt. 106.)  Seven other members of the organization had been named in earlier indictments.  (*See* Indictment, Dkt. 10; First Superseding Indictment ("S-1"), Dkt. 16; Second Superseding Indictment ("S-2"), Dkt. 38; Third Superseding Indictment ("S-3"), Dkt. 58.)  The S-4 Indictment contained ten counts, and all defendants were charged with drug conspiracy, in violation of 21 U.S.C. § 841(b)(1)(A), in Count One of the S-4 Indictment ("Count One" or the "drug offense").  (Dkt. 106.)  Mateo-Feliz alone was charged with assault in aid of racketeering (Count Five) and use of a gun in that assault (Count Six).

The S-4 Indictment also included five counts charging one or more of the defendants with murder while engaging in the drug offense in violation of 21 U.S.C. § 848(e)(1)(A).  Mateo-Feliz alone faced a count for the murder of Jessie Green (Count Two); Mateo-Feliz and Pellicier were charged in the murders of Alfredo Flores (Count Nine) and Billy Mercado (Count Ten); and Mateo-Feliz and Freeman were charged with the murders of Augustin Sosa (Count Three) and Freddy Gonzalez (Count Seven)—murders directed by Mateo-Feliz and purportedly committed by Freeman.  Freeman faced two additional charges for use of a firearm during, and in relation to, a crime of violence pursuant to 18 U.S.C. § 924(c)(1) (Counts Four and Eight).

On May 7, 1998, Mateo-Feliz pled guilty to Count Six, use of a firearm, and Count Ten, the Mercado murder. (*See* 5/7/1993 Calendar Entry.) On March 8, 1999, the Honorable Jack B. Weinstein, downwardly departing from the Sentencing Guidelines, sentenced Mateo-Feliz to consecutive terms of 25 years for the murder count and five years on the firearms count, as well as concurrent, five-year terms of supervised release. (*See* 3/8/1999 Calendar Entry; *see also* Judgment as to Roberto Mateo-Feliz, Dkt. 207.) According to the Bureau of Prisons ("BOP") website, Mateo-Feliz was released from federal custody on December 9, 2022, after being incarcerated for over 26 years.

Pellicier was named in a subsequently filed, three-count felony information charging him with drug conspiracy, the murder of Flores, and the murder of Mercado. (*See United States v. Pellicier*, 98-CR-382, Dkt. 2.) Pellicier pled guilty to the information, and Judge Weinstein sentenced him, in effect, to ten years in prison and five years' supervised release. (*See id.*, Tr. of 5/13/1999 Hr'g, Dkt. 17.) The pending counts against Pellicier in the instant case were dismissed on the Government's motion. (*See* 5/13/1999 Docket Order.) According to the BOP website, Pellicier was released from federal custody on August 21, 2009, after being incarcerated for over 11 years.

Freeman was the only defendant who went to trial. After a jury trial before the Honorable Sterling Johnson, Jr., Freeman was convicted on three counts: Count One, the drug conspiracy; Count Seven, the Gonzalez murder; and Count Eight, the § 924 charge for use of a firearm in connection with that murder. Freeman was acquitted of the Sosa murder.[3] On October 27, 1998, Judge Johnson sentenced Freeman to two consecutive life terms on Counts One and Seven, and

---

[3] In light of the acquittal on the predicate murder charge, the jury did not consider Count 4, the related § 924(c) count.

3

five years' imprisonment on the § 924 count to run consecutively to the two life terms. (Judgment, Dkt. 190.) He also imposed terms of five years of supervised release on each of the three counts, to run concurrently. (*Id.*)

Freeman appealed, and his conviction and sentence were affirmed by the Second Circuit on October 29, 1999. *See United States v. Mateo-Feliz,* No. 98-1643, 1999 WL 1024616 (summary order) (2d Cir. 1999). In addition to the direct appeal, Freeman has also sought post-conviction relief from this court via several unsuccessful collateral attacks.[4] In ruling on one such motion, Judge Johnson denied Freeman's request to reduce his sentence due to a change in the Sentencing Guidelines, finding that the Guidelines offense level underlying the drug conviction was based on the murder, thus making him ineligible for resentencing. (8/21/2009 Mem. & Order, Dkt. 261.) Judge Johnson further noted that even if Freeman were eligible, application of the § 3553(a) factors, such as the serious and violent nature of the crime of murder, weighed against a reduction. (*Id.* at 4 (concluding that "[a] sentence of life imprisonment remains sufficient but not greater than necessary to protect the public and deter future crimes by Freeman")).

Freeman now moves pursuant to the First Step Act for compassionate release or a reduction in his sentence. He argues in one of his *pro se* submissions that compassionate release is warranted given his health and the risks associated with the COVID-19 pandemic. (*See* Dkt. 314.) The motion submitted by Freeman's lawyer on his behalf, however, states that Freeman is no longer seeking relief on the basis of COVID-19, but instead argues that his health and age are appropriate factors to consider. (Dkt. 328, at 3). Freeman ultimately urges the Court to consider four factors:

---

[4] *See Freeman v. United States*, No. 01-CV-720 (SJ), 2005 WL 1498289 (E.D.N.Y. June 17, 2005) (denying relief under 28 U.S.C. § 2255), *aff'd*, 258 F. App'x 372 (2007); Dkts. 277, 282 (successive §2255 motion and denial of that motion). The Court presumes the parties' familiarity with those motions; any discussion of the resulting decisions is limited to those relevant to the resolution of the motions currently before the Court.

(1) his health and age; (2) the disparity of his sentence as compared with those of his co-defendants and others convicted of the same crimes; (3) his rehabilitation efforts; and (4) whether he poses a future danger to society. (*Id.* at 3.) In support of his motion, Freeman has submitted over 50 letters of support including approximately 16 from family members and friends, 10 from prison officials and staff, and 24 from fellow inmates. He argues that all of these factors make a compassionate release or sentence reduction appropriate. Freeman also contends in his *pro se* submission that, pursuant to § 404 of the First Step Act, he is entitled to a reduction in sentence via retroactive application of the Fair Sentencing Act of 2010 (the "FSA"), which increased the amount of crack required for conviction of certain drug offenses.[5] (Dkt. 306, at 2–6.)

In opposition, the Government contends that Freeman has not demonstrated an extraordinary and compelling reason for compassionate release or a reduced sentence. The Government's opposition focuses upon criteria set forth in United States Sentencing Guidelines ("Sentencing Guidelines") § 1B1.13. Although the Government acknowledges that the Court is not bound by the Sentencing Guidelines, it suggests that "adopting section 1B1.13 as the definition for 'extraordinary and compelling reasons' would give due respect to Congress' express delegation of definitional power to the Commission." (Gov't Opp'n 2, at 3–4.) Applying the § 1B1.13 criteria, the Government argues that Freeman's medical conditions are not extremely serious or life-threatening, and therefore are not extraordinary and compelling reasons warranting compassionate release. (Govt Opp'n 2, at 4.) It notes that while Freeman's conduct in custody has improved over the last eight years, "it is not tantamount to full rehabilitation," and moreover,

---

[5] Because the Court decides this motion on the basis of extraordinary and compelling circumstances, it need not reach Freeman's arguments regarding his eligibility for resentencing pursuant to § 404(b) of the First Step Act, which made retroactive the Fair Sentencing Act's increased threshold quantities of cocaine base required to trigger mandatory minimum sentences under the Controlled Substances Act.

rehabilitation is not, by itself an extraordinary and compelling reason. (*Id.* at 5.) The Government does not address several of Freeman's arguments including, *inter alia,* those premised on the sentencing disparity between Freeman and his co-defendants. As to Freeman's claim that a reduction in the drug offense sentence is warranted under the FSA, the Government argues that his sentence was not based on any threshold amount of narcotics, but rather was premised on the murder conviction. (Govt Opp'n, at 3.)

## LEGAL STANDARD

"A court may not modify a term of imprisonment once it has been imposed except pursuant to statute." *United States v. Applewhite,* No. 17-CR-142 (MKB), 2020 WL 7356615, at *3 (E.D.N.Y. Dec. 15, 2020) (quoting *United States v. Gotti*, 433 F. Supp. 3d 613, 614 (S.D.N.Y. 2020)). One such statutory exception is provided in 18 U.S.C. § 3582, the vehicle for defendants seeking "compassionate release" from sentences.[6] Originally, only the BOP could act on a motion for relief under this section, exercising "absolute control over th[e] mechanism for lenity[.]" *Brooker*, 976 F.3d at 231. However, the First Step Act modified § 3582 to permit a district court to modify a defendant's sentence if the defendant could show that (1) he or she has satisfied the statutory exhaustion requirement, (2) extraordinary and compelling reasons exist warranting a sentence reduction, and (3) a sentence reduction is appropriate "after considering the factors set forth in [18 U.S.C. §] 3553(a) to the extent that they are applicable," so long as "extraordinary and compelling reasons warrant such a reduction . . . and that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission." 18 U.S.C. § 3582 (c)(1)(A).

---

[6] "It bears remembering that compassionate release is a misnomer," as the section "in fact speaks of sentence reductions." *United States v. Brooker,* 976 F.3d 228, 237 (2d Cir. 2020). In granting a motion, a district court "could, for instance, reduce but not eliminate a defendant's prison sentence, or end the term of imprisonment but impose a significant term of probation or supervised release in its place." *Id.*

It is defendant's burden to show he is entitled to a sentence reduction. *See United States v. Lugo,* No. 01-CR-922 (NG), 2022 WL 732153, at * 7 (E.D.N.Y. Mar. 11, 2022).

When considering a motion for compassionate release, the First Step Act "freed district courts to consider the full slate of extraordinary and compelling reasons that an imprisoned person might bring before them in [such] motions." *Brooker,* 976 F.3d at 237 (finding that "[b]ecause [Sentencing] Guideline § 1B1.13 is not 'applicable' to compassionate release motions brought by defendants [as compared to those brought by the BOP], Application Note 1(D) cannot constrain district courts' discretion to consider whether any reasons are extraordinary and compelling"); *see also United States v. Haynes,* 456 F. Supp. 3d 496, 514 (E.D.N.Y. 2020) (the district court has the authority to "determine what 'Other Reasons' (as that term is used in Application Note 1(D)) qualify as 'extraordinary and compelling' regardless of the BOP's view on the matter and without having to await a someday-updating by the Commission of its unquestionably outdated policy statement"). "The only statutory limit on what a court may consider to be extraordinary and compelling is that '[r]ehabilitation . . . *alone* shall not be considered an extraordinary and compelling reason.'" *Brooker,* 976 F.3d at 237-38 (quoting 28 U.S.C. § 994(t) (emphasis added)).

Upon finding that a defendant has demonstrated the existence of extraordinary and compelling reasons for a reduction, the Court must then consider the factors set forth in 18 U.S.C. § 3553(a). *See United States v. Fernandez*, 853 F. App'x 730, 732 (2d Cir. 2021) (summary order) ("Even if 'extraordinary and compelling' circumstances exist, a district court must also consider 'the factors set forth in section 3553(a) to the extent that they are applicable" before granting a sentence reduction." (quoting § 3582(c)(1)(A)); *United States v. Schwarzkopf*, No. 21-CR-117 (EK), 2022 WL 706508, at *1 (E.D.N.Y. Mar. 9, 2022) (a showing of extraordinary and compelling reasons "renders [a defendant] eligible for, but not entitled to, a sentence reduction;

the court must still consider the Section 3553(a) factors anew"). Among the relevant factors to be considered in deciding a motion for compassionate release are: (1) the nature and circumstances of the offense; (2) the history and characteristics of the defendant; (3) the need for the sentence "to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment;" (4) to provide deterrence; (5) to protect the public from the defendant; (6) to rehabilitate the defendant; and (7) the need to avoid unwarranted sentencing disparities. *United States v. Russo*, 643 F. Supp. 3d 325, 335 (E.D.N.Y. 2022) (citing § 3553(a)). While the factors should be considered by the court, it is not required to "discuss every § 3553(a) factor individually." *United States v. Keitt*, 21 F.4th 67, 72 (2d Cir. 2021) (citation omitted).

## DISCUSSION

### I. Extraordinary and Compelling Circumstances

The Court first turns to whether "extraordinary and compelling reasons" exist to qualify Freeman for compassionate release.[7] *Brooker,* 976 F.3d at 236. "The Court need not find a single dispositive circumstance to determine that extraordinary and compelling reasons exist; rather, it may consider whether the totality of the circumstances justify such a finding." *United States v. Piggott*, No. 94-CR-417 (SHS), 2022 WL 118632, at *2 (S.D.N.Y. Jan. 12, 2022). Considering the totality of the circumstances, the Court concludes that Freeman has met his burden of showing that extraordinary and compelling circumstances exist.

#### A. Sentencing Disparity

First and foremost, the Court cannot overlook the stark disparity between the sentence Freeman received and the sentences of his co-defendants—particularly, Mateo-Feliz, the gang's

---

[7] There is no dispute that Freeman has exhausted his administrative remedies. His request for compassionate release addressed to the BOP was denied on May 19, 2020. (Dkt. 314, Ex. A.)

8

leader. Mateo-Feliz, the undisputed head of the organization who ordered five killings and to whom Freeman reported, was sentenced to a total of 30 years, and has completed his imprisonment and is a free man; Freeman, convicted of a single murder at Mateo-Feliz's direction, was sentenced to two life terms plus five years and will spend the rest of his life in prison.[8]  Based on the circumstances here, the Court cannot find a compelling rationale to justify the disproportionately harsh sentence that Freeman received.  *See generally Lugo,* 2022 WL 732153, at *8 (seeing "no reason for [the defendant] to serve a sentence that requires him to die in prison while these other men [from the same criminal organization] serve 30 years").

Although Freeman went to trial—thereby foregoing a potentially favorable plea deal with the Government and the acceptance-of-responsibility reduction under the Sentencing Guidelines—while his co-defendants pled guilty pursuant to plea agreements with the Government, that difference in itself does not justify the dramatic disparity between Freeman's and his co-defendants' sentences, especially given that each of them was convicted of participating in at least one murder.  *See Russo,* 643 F. Supp. 3d at 335 (although taking responsibility "should result in a lower sentence . . . , it is often disproportionately reflected in how co-defendants are sentenced and charged"); *Haynes,* 456 F. Supp. 3d at 514 (considering the "extent to which the brutal sentence was a penalty for [defendant's] exercise of his constitutional right to trial" and finding "drastic severity" between 46-year sentence of defendant who went to trial compared to 10-year sentence

---

[8] This analysis focuses on Freeman's murder conviction because the life sentence he received on the drug conspiracy was derived from Guidelines calculations necessitated by the murder conviction.  As to Freeman's co-defendants, Mateo-Feliz did not plead guilty to the drug conspiracy and Pellicier's plea to the drug conspiracy and two murders netted him 10 years in prison.  (*United States v. Mateo-Feliz*, 96-CR-527, Dkt. 207; *United States v. Pellicier*, 98-CR-382, Dkt. 8.)  Other co-defendants who were not charged with murder received lower sentences upon pleading guilty to the drug offense.  The highest of these was 70 months imposed upon Giovanni Rubiroza.  (*See United States v. Mateo-Feliz*, 96-CR-527, 6/10/1999 Calendar Entry.)

imposed on co-defendant who accepted a plea). Mateo-Feliz, allocuted to five murders involving firearms and was sentenced to 25 years in prison for pleading guilty to one of them (Mateo-Feliz PSR ¶ 51), along with a single consecutive five-year term for one § 924 charge; Freeman exercised his right to trial, was acquitted of one murder and convicted of another murder, and ultimately received two life sentences[9] plus a consecutive five-year term for the one § 924 conviction. Notably, the Government does not point to any distinguishing facts, such as the two defendants' personal characteristics or their criminal histories, that could explain the gulf between their sentences. The Court finds that the gross sentencing disparity between Freeman and Mateo-Feliz is an extraordinary and compelling factor that favors a sentencing reduction in this case. *See generally Russo,* 643 F. Supp. 3d at 334 (noting that "[c]ourts have found that a gross disparity between sentences of co-defendants stemming from their choice to exercise or forgo their constitutional right to a trial is an extraordinary and compelling factor."); *United States v. Ballard*, 552 F. Supp. 3d 461, 468 (S.D.N.Y. 2021) ("[T]he Court concludes that the gross disparity between [defendant's] and his co-defendant's sentences provides another reason to find that the extraordinary and compelling circumstances of this case warrant a sentence reduction.").[10]

### B. Defendant's Health

Freeman points to his age and health condition as additional factors supporting a finding of extraordinary and compelling circumstances. (Dkt. 326, 7–12.) Freeman is 58 years old and suffers from numerous chronic conditions, including hypertension and pre-diabetes, has physical

---

[9] Although convicted of only one murder, for which he received one non-mandatory life sentence, Freeman was sentenced to a second non-mandatory life term for his conviction on the drug offense in Count 1, based on a killing having resulted from that conspiracy. *See* 18 U.S.C. § 1111.

[10] To be clear, the Court does not find that Freeman's sentence was unconstitutionally vindictive or that there is any evidence to support an attack on the validity of the sentence.

10

pain in his back, knee, and shoulder, is classified as obese, has acid reflux, and recently underwent hip surgery. (*Id.* at 8; *see also* Dkt. 349-1, Exhibit HH.) Freeman, however, does not provide evidence that these conditions have not been, or cannot be, managed and/or treated in prison. So, in themselves, these conditions do not warrant a sentencing reduction. *United States v. Diaz Osorio*, No. 13-CR-426 (FB) (RER), 2022 WL 7132203, at *1 (E.D.N.Y. Oct. 12, 2022) (denying compassionate release for defendant who had health issues including obesity, pre-diabetes, hypertension, and hyperlipidemia).

Freeman no longer suggests that the risk of contracting COVID-19 by itself constitutes an extraordinary and compelling circumstance warranting compassionate release, and the Court agrees that the risk of COVID infection given Freeman's general health, in itself, would likely not rise to the level of severity warranting compassionate release. However, although a defendant's "heightened risk of COVID-19 may not alone suffice as an extraordinary and compelling reason, in combination with the other factors, it weighs towards granting a reduction." *Russo,* 643 F. Supp. 3d at 333; *see also United States v. Nelson,* No. 10-CR-820 (NGG), 2022 WL 1469465, at *5 (E.D.N.Y. May 10, 2022) ("Although the Court generally agrees [] that [the defendant] has not demonstrated that he is a high-risk individual, the Court still considers the pandemic prison conditions as a factor in its analysis."). Therefore, the Court considers Freeman's health issues in combination with his risk of contracting COVID-19 in prison as one of the several factors contributing to its finding that extraordinary and compelling reasons to reduce Freeman's sentence exist. *See United States v. Snype*, -- F. Supp. 3d --, 2023 WL 4622870, at *9 (E.D.N.Y. July 19, 2023) (granting compassionate release where defendant's "medical situation," which the court found to be not so "serious" to constitute "extraordinary and compelling" on its own, was still "a factor to consider").

11

### C. Rehabilitation

Freeman also points to his rehabilitation efforts as further support for a finding of extraordinary and compelling reasons warranting a sentence reduction. The Court finds that these efforts provide further support for a sentencing reduction.

In addition to completing his GED, Freeman has completed education courses in a wide range of subjects. Between 1997 and early 2019, Freeman completed approximately 30 courses on subjects such as anatomy, stress management, public speaking, and automotive service tech training. (Summary Reentry Plan, Dkt. 328-21.) Lt. H. Reedy at FCC Allenwood commented that Freeman "has always been program[m]ing and taking classes ever since I have known him," and has been productive in the use of his time. (Dkt. 306, Ex. D3.)

Although Freeman had several disciplinary infractions early in his incarceration, he has not had one since January 2014. (*See* Dkt. 306, Ex. D5.) According to Lt. Reedy, Freeman was transferred to FCC Allenwood in 2012 "after working his way down in security level from Federal Penitentiaries to Federal Correctional Institutions for good behavior. (Dkt. 306, Ex. D3.)

In addition, Freeman's application is supported by approximately 50 letters from family, friends, prison staff, and inmates attesting to his character and urging that he be given a second chance. Some of the most compelling letters regarding Freeman's character are letters written by staff members at FCC Allenwood. Capt. L. Hunter writes that Freeman "has always handled himself in a respectful and helpful matter," that he has observed Freeman "going out of his way to help staff and inmates alike," and that he "helps to mentor younger inmates." (Dkt. 306, Ex. D2.) Capt. Hunter believes that Freeman deserves a second chance and that if given one, he "would not waste the opportunity to reconnect with his family and become a productive member of society." (*Id.*) Lt. Reedy writes that Freeman "has been a model inmate who has respect from both inmates

12

and staff alike" and that he often intervenes to stave off a situation "before it would ever become a problem, due to [the] respect level he has from the inmate population." (Dkt. 306, Ex. D3.) Lt. Reedy states that he wishes Freeman a "second chance at life," concluding that "I have never met an inmate more deserving th[a]n Freeman [of] this opportunity." (*Id.*) Lt. J. Olshefski notes that since starting employment with the BOP in 2000, he has never written a letter of recommendation before for any inmate, but "feels strongly that Freeman is deserving of a second chance at life in our society." (Dkt 306, Ex. D4.) He has observed Freeman "providing positive feedback to younger inmates on how to behave in a correctional setting," and has "displayed sincere remorse for being incarcerated and not being a part of his son's life." (*Id.*)

Freeman held a steady position at FCC Allenwood in the recreation department, and has submitted numerous Performance Ratings from his supervisor reflecting top marks across the board. (Dkt. 306, Exs. D6–9). Those supervisors, who worked with Freeman each day for multiple hours over a period of years, "only have magnificent things to say" about him (Dkt. 306, Ex. D7), calling him a "great leader" (Dkt. 306, Ex. D9), a "stellar employee," a "role model" who has "obtained the respect of his fellow inmates" (Dkt. 306, Ex. D8), and "an outstanding leader and example for the entire inmate population." (Dkt. 306, Ex. D6.)

Freeman maintains close contact with his family, many of whom have submitted letters in support of his release including, *inter alia,* his mother, brother, sister-in-law, sister, aunt, and cousin. (Dkt 328, Exs. A–G.) Also of note is the letter of support from his adult son, Raheem Freeman. (Dkt. 328, Ex. I.) In it, Raheem discusses the "3Ds" or "Discipline Determines Destinies" organization, a concept for a youth organization that he and his father have worked on together. Freeman came up with the concept and created logos, and Raheem has registered the organization with the New York Department of State and made contact with community leaders.

13

"I have started the process but I wait for his release so we can really put in the work together as father and son to truly change lives and communities." (*Id.*)

Freeman's record of educational accomplishments, continuous and steady work, and sterling letters of support from prison staff, inmates, family, and friends—collectively highlighting his character, leadership qualities, willingness to mentor other inmates, and desire to better the community—are impressive and noteworthy. The Government argues that Freeman's conduct "is not tantamount to full rehabilitation." (Govt Opp'n, at 5.) Freeman's rehabilitation, however, must be viewed through the lens of an individual facing life in prison. In spite of receiving two life sentences (plus five additional years) and spending nearly half of his life in prison, Freeman has made the most of his circumstances and sought to help others. *See United States v. Rodriquez*, 492 F. Supp. 3d 306, 313 (S.D.N.Y. 2020) ("That [defendant] has developed such an outstanding record in prison without any tangible incentive other than self-improvement, given that his life sentence meant that he could neither earn any good time credit nor receive any other sentence reduction benefit weigh[ed] all the more strongly still [in favor of modifying defendant's sentence].") (internal quotations and citation omitted)). And while the Court recognizes that rehabilitation alone cannot constitute an extraordinary and compelling reason, his strong record in this regard is yet another factor in favor of a sentencing reduction, and a compelling one at that. *See Snype*, 2023 WL 4622870, at *10 ("[R]ehabilitation alone is not enough, but I do not consider Snype's rehabilitation in a vacuum.").

\*\*\*

Although each reason presented, viewed in isolation, might not suffice to warrant a sentence reduction, the factors presented by Freeman—the unjustifiably large sentencing disparity between Freeman and his co-defendants, his deteriorating health and the increased risk of harm

14

from COVID-19 infection, and his strong record of rehabilitation—constitute extraordinary and compelling circumstances.

**III. Section 3553(a) Factors**

Having found that Freeman has demonstrated extraordinary and compelling reasons for relief, the Court analyzes the relevant § 3553(a) factors: (a)(1) "the nature and circumstances of the offense and the history and characteristics of the defendant"; (a)(2) the need for the imposed sentence (A) "to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense[,]" (B) "to afford adequate deterrence to criminal conduct[,]" and (C) "to protect the public from further crimes of the defendant"; and (a)(6) "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." *See generally* 18 U.S.C. §§ 3553(a); *see also Keitt*, 21 F.4th at 72 (a district court is not required to "discuss every § 3553(a) factor individually."). On the record before it, the Court finds that application of the § 3553(a) factors support a reduction in Freeman's sentence and that maintaining his current sentence would result in a sentence that is "greater than necessary[] to comply with the purposes of [§ 3553(a)(2)]." 18 U.S.C. § 3553(a).

As for the nature and circumstances of the offense, the seriousness of Freeman's crimes cannot be overstated. Indeed, the Government argues that "the gravity of the crimes for which [Freeman] was convicted" weigh against release. (Govt Opp'n 2, at 6.) The Government's arguments regarding the need for the sentence to reflect the seriousness of the crime and to provide just punishment and adequate deterrence, however, are directed solely at Freeman's offense conduct and do not account for his personal "history and characteristics," especially with respect to post-sentence rehabilitation. Freeman's prior offenses occurred nearly three decades ago and he "has maintained a positive prison record," if not an exemplary one, despite having no reasonable

15

expectation of release, over the past decade. *Snype*, 2023 WL 4622870, at *10 (finding that despite committing multiple armed robberies, engaging in a high-speed chase where the defendant shot at law enforcement officers, and actions that led to the death of an accomplice, the length of time since defendant's offenses and his good prison record militated against the seriousness-of-the-crime sentencing factor). Freeman also maintains strong connections with his family and has been a mentor to those in his prison community during his lengthy incarceration. Additionally, courts in this circuit have granted compassionate release to prisoners serving life sentences notwithstanding convictions for heinous crimes. *See, e.g.*, *United States v. Fisher*, 493 F. Supp. 3d 231, 236, 239 (S.D.N.Y. 2020) (granting release after thirty-eight years of defendant who likely murdered multiple victims during course of significant drug trafficking conspiracy); *Rodriguez*, 492 F. Supp. 3d at 308 (reducing sentence to thirty years where defendant participated in torture and murder of government informant). Indeed, as discussed, Freeman's co-defendants received far more lenient sentences despite committing equally—and in Mateo-Feliz's case, much more—serious crimes.

      As to the need to avoid disparate sentences, the Government's argument against compassionate release does not acknowledge the vast disparity between the sentence Freeman received versus the sentences of his co-defendants for committing the same or similar crimes, including murder. The differences between sentences given to defendants who went to trial and those who took plea deals "is not only a factor worthy of consideration as an extraordinary circumstance, but also is a powerful § 3553(a) factor." *Russo,* 643 F. Supp. 3d at 335. For the reasons discussed above, the gross sentencing disparity here weighs heavily in Freeman's favor. The implied argument that only a life sentence is adequate to constitute a just punishment and serve as a deterrent in this case is belied by the fact that Mateo-Feliz, who not only led an enormous

16

trafficking organization, but was responsible for at least five murders and directed the murder that Freeman was convicted of, was offered a plea deal that resulted in a 30-year sentence (25 years for the murder and five years for the gun charge). As the court in *Russo* observed, "[i]f the Government in offering its plea deals did not believe that all those indicted on murder charges should be sentenced to life, why should the court?" *Russo,* 643 F. Supp. 3d at 335. At a minimum, it is reasonable to infer that the Government believed that a 30-year sentence for a defendant who was a drug kingpin and admitted involvement in five murders complied with the purposes of sentencing codified in § 3553(a)(2), such as reflecting the seriousness of the crime, promoting respect for the law, providing just punishment for the offense, affording adequate deterrence to criminal conduct, and protecting the public from future harm by Mateo-Feliz.

The Court finds that, as discussed *supra*, the disparity of Freeman's sentence as compared with his co-defendants, particularly that of Mateo-Feliz, is overly harsh and does not constitute "just punishment" under the circumstances of this case. 18 U.S.C. § 3553(a)(2)(A). Freeman has, to date, served over 26 years in custody. Thus, Freeman's time in prison is also above the national average for federal sentences for murder, which in recent years, was a sentence of approximately 22 years. *See United States v. Tellier*, No. 92-CR-869 (LGS), 2022 WL 1468381, at *4 (S.D.N.Y. May 10, 2022) (citing U.S. Sentencing Commission data showing that "the median sentence length for murder for fiscal years 2015 through 2021 was 240 months, the median length of imprisonment was 240 months, the average sentence length was 262 months and the average length of imprisonment was 263 months"); *Lugo,* 2022 WL 732153, at *10 (citing data showing the recent average federal murder sentence to be "slightly over 20 years"). As with his co-defendants and consistent with national averages, a sentence less than life would adequately serve to confirm the seriousness of the crime, constitute a just punishment, and serve as a deterrent.

17

As for the need to protect the public from future crime by Freeman, the Court notes that his crimes in this case were committed in the context of a complex drug conspiracy. Gonzalez, Freeman's victim, was a rival drug dealer whose murder was ordered by Mateo-Feliz after Gonzalez failed to pay for cocaine he had received on consignment. (PSR ¶ 9.) Therefore, Freeman's crime, albeit violent, is not one that involved the public at large. *See Russo,* 2022 WL 17247005, at *8 (finding defendant unlikely to pose a danger to the general public where defendant was convicted for murders that "were not directed at the public at large but were internecine executions of ruthless rival gang members.").[11]  Regarding the risk of recidivism as to drug trafficking, because Freeman was not involved in the day-to-day operations of Mateo-Feliz's organization, there is no reason to believe that he would become involved in the drug trade in any way if released from prison.

Finally, the Court is satisfied that upon his release, Freeman will take advantage of his support system of family and friends to help him acclimate to life outside of prison and help him lead a law-abiding and productive life in the community. *See, e.g.,* Dkt. 328, Ex. A (brother states that the family is prepared to help him, having a "plan for his travel, permanent housing, and how we will support him" and "ensuring he has the necessary things (food, clothing and shelter)"); Dkt. 328, Ex. F (sister plans to take FMLA leave to assist in his re-entry); Dkt. 328, Ex. I (son's letter describing the "3Ds" youth organization he and his father plan to develop if Freeman is released).

Having considered all the § 3553(a) factors, including the nature of Freeman's crimes and his history, the Court believes that a sentence reduction is warranted.[12]

---

[11] Indeed, the only victim in this case who was uninvolved in the drug trade and was, in effect, an innocent bystander, was a man murdered under the orders and in the presence of Mateo-Feliz. (PSR ¶ 26.)

[12] Judge Johnson reached a different conclusion in his August 2009 decision applying the § 3553(a) factors and denying a reduction in sentence. However, during the intervening 14 years

## CONCLUSION

For the reasons set forth above, Freeman's motion for compassionate release is granted, and his sentence of two consecutive life terms and one consecutive five-year term of imprisonment is modified to:

- Ten (10) years on Count One to run concurrently with the sentence on Count Seven,

- Twenty Five (25) years on Count Seven to run concurrently with the sentence on Count One,

- Five (5) years on Count Eight, to run consecutively to the sentences on Counts One and Seven,

for a total of thirty (30) years' imprisonment, to be followed by two years of supervised release on each count to run concurrently with each other.  All other aspects of Freeman's sentence remain in full force and effect.

The Clerk of Court is respectfully directed to prepare the appropriate amended judgment.

SO ORDERED.

*/s/ Pamela K. Chen*
Pamela K. Chen
United States District Judge

Dated: October 5, 2023
       Brooklyn, New York

---

and despite the denial, Freeman continued to conduct himself in an exemplary manner in prison, not only by avoiding disciplinary infractions and working, but by increasing his educational programming and by becoming a role model and mentor to other inmates, thereby earning the respect of prison staff and inmates alike, as well as their unequivocal support for his renewed application for a sentencing reduction.

19